

# THE ATTORNEY GENERAL
## OF TEXAS

PRICE DANIEL
ATTORNEY GENERAL

AUSTIN, TEXAS

May 15, 1950

Hon. B. F. McKee
County Auditor
Hidalgo County
Edinburg, Texas

Opinion No. V-1057.

Re: The authority of counties to use an excess of the State tax remission, over the annual bond retirement requirements, to build and maintain farm-to-market roads.

Dear Mr. McKee:

You have requested the opinion of this office on the above-captioned matter.

Section 51 of Article III of the Texas Constitution provides in part as follows:

"The Legislature shall have no power to make any grant or authorize the making of any grant of public moneys to any individual, association of individuals, municipal or other corporations whatsoever; provided, . . . further, that the provisions of this section shall not be construed so as to prevent the grant of aid in cases of public calamity." (Emphasis added throughout.)

Section 10 of Article VIII of the Constitution provides:

"The Legislature shall have no power to release the inhabitants of, or property in, any county, city or town from the payment of taxes levied for State or county purposes, unless in case of great public calamity in any such county, city or town, when such release may be made by a vote of two-thirds of each House of the Legislature."

It is clear that these constitutional provisions themselves would prevent the use of remitted tax funds for any purpose other than the prevention of public calamities, under the conditions set forth in the statutory grant, unless there is some subsequently adopted constitutional provision that provides otherwise.

In Opinion No. 0-1276 this office ruled that:

"The calamity clause in Article 3, Section 51, of the Constitution was not intended to provide a vehicle for the wholesale transfer of money from one constitutional fund to another. It was written into the Constitution to enable the State as a whole to extend relief to those parts of its areas which from time to time might be stricken with such calamitous visitations as fire, flood, tempest or disease. We think the term 'public calamity' has the same meaning in Article 3, Section 51, as in Article 8, Section 10 of the Constitution. In the case of Jones v. Williams, 45 S.W. 2d 130, the question as to the constitutionality of a tax remission bill of state-wide scope was before the Supreme Court. In that Act the Legislature had found as a fact that the 'present world-wide economic crisis' constituted a public calamity. We take the following excerpts from Chief Justice Cureton's opinion:

" 'As stated, the Legislature was of the opinion that the present industrial depression was a "great public calamity" within the meaning of Section 10, Article 8, of the Constitution. With that interpretation of the Constitution we cannot agree. The word "calamity" indicates or supposes a somewhat continuous state, produced not usually by the direct agency of man, "but by natural causes, such as fire, flood, tempest, disease," etc. Webster's Revised Unabridged Dictionary . . . '

"We think it clear that it was thus contemplated and intended that levies for State and county purposes should be kept separate and distinct; and that taxes collected for county purposes should not be appropriated for State uses, nor taxes collected for State purposes diverted to county uses."

Section 1-a of Article VIII of the Constitution was amended in 1948 to provide in part as follows:

"Provided that in those counties or political subdivisions or areas of the State from which tax donations have heretofore been granted, the State Automatic Tax Board shall continue to levy the full amount of the State ad valorem tax for the duration of such donation, or until all legal obligations heretofore authorized by the law granting such donation or donations shall have been fully discharged, whichever shall first occur; provided that if such donation to any such county or political subdivision is for less than the full amount of State ad valorem taxes so levied, the portion of such taxes remaining over

and above such donation shall be retained by said county or subdivision. Sec. 1-a, Art. 8, adopted election Nov. 2, 1948."

After the amendment of Section 1-a, the 51st Legislature enacted Chapter 464, codified as Article 7048a, V.C.S. Section 10(a) provides in part as follows:

"(1) Beginning in the year 1951 and each year thereafter the State Automatic Tax Board created by Article 7041 of the Revised Civil Statutes of Texas, 1925, shall cause to be levied annually in each county, political subdivision or other defined area, the full thirty cents (30¢) State ad valorem tax for general revenue purposes, the proceeds of which heretofore were donated and granted by the Legislature to certain counties, political subdivisions or other defined areas for the purpose of carrying out and performing actions of preventing calamities, improving, protecting and reclaiming certain areas for and on behalf of the State as more fully declared in each applicable law or laws making such donation or grant and said Board shall continue to levy such tax at said rate in each such designated area until the bonds or other obligations of said areas authorized or incurred in connection with the performance of such action on behalf of the State shall have been fully paid or discharged or until the expiration date of such donation or grant as may be determined from the law or laws making such grant or donation, whichever shall first occur. . . .

"(3) The tax assessors and collectors in each of such Counties shall continue to assess and collect such tax and make the proceeds thereof available to the donees or grantees in the manner provided by the law or laws making each such grant or donation. The moneys thus collected by said tax assessors and collectors and received by such grantees or donees shall be used and accounted for annually as prescribed by the law or laws making such grant or donation.

"(4) In those instances where less than the full State general ad valorem tax was granted or donated, the portion of the money collected in excess of the amount donated or granted shall be paid over to the governing body of the county or political subdivision from which such tax is collected and in the discretion of said governing body shall be used either for the construction and maintenance of Farm-to-Market Roads or for Flood Control only within the county. . . . "

Thus, we see that, under both the Constitution and the statutes, the donated taxes can be used only for the prevention of the recurrence of public calamities, under the conditions set forth in the statutory grants. The donation is to continue until the end of the statutory grant or until all obligations are paid, whichever shall occur first.

Manifestly, the construction and maintenance of farm-to-market roads would not constitute a prevention of recurrence of public calamities within the contemplation of the Constitution or statutes.

## SUMMARY

State ad valorem taxes donated or granted to counties to prevent the recurrence of "great public calamities" caused by calamitous overflows, floods, storms, and the like, cannot be diverted to the construction and maintenance of farm-to-market roads.

Yours very truly,

PRICE DANIEL
Attorney General

By Frank Lake

Frank Lake
Assistant

APPROVED:

W. V. Geppert
Taxation Division

Joe R. Greenhill
First Assistant

Price Daniel
Attorney General

FL/ls/mwb